May it please the court, Sarah McMillan for WildEarth Guardians. This case is about one of the first regional haze plans developed by a state and approved by the EPA. And WildEarth Guardians has raised three primary arguments about the statutory failings of that plan and EPA's approval of that plan. And this is important because it is one of the first regional haze rule plans, regional haze plans. This court's decision will have precedential effect on the remaining state's development of plans and EPA's approval or disapproval or conditional approval of those plans. And that precedent is also important because the regional haze rule is intended to protect visibility at some of our most treasured landscapes, our national parks and our wilderness areas. It's also protective of human health, which the EPA recognized in two separate rules, its 1999 rule and its 2005 rule, where it actually monetized the health benefit of reducing haze and estimated that by 2015, which I think is probably a little bit optimistic at this point because the implementation of the plan has taken a little longer than envisioned. But by 2015, EPA estimated that the health benefits from reducing haze would be in the range of $2 to $14 billion. So health is important. Visibility is important for these treasured landscapes. And that's why Guardians wants to see this law appropriately and meaningfully implemented. So I'd like to ask you a quick question here just to start off before we get into the details of the plan. As you know, standing is an issue at all times. And although I have no question about the power plant and the like, I'm a little concerned that Veronica Egan has never even been in Jarbridge and doesn't plan to ever go there. How does she meet the standing requirement? She may have injury and think she sees something, but in terms of redressability, in terms of causation, how does she meet the standing requirement? Your Honor, thank you for raising that issue. I'm going to do it. I think obviously that's a very important issue. And the two main arguments that the interveners raised, EPA didn't challenge standing, but the two main arguments that intervener raised were, first of all, what you've raised, Your Honor, that Ronnie has not visited Jarbridge, and secondly, that health interests aren't part of what the Clean Air Act is intended or this section of the Clean Air Act is intended to address. And relating to Ronnie's not having visited Jarbridge, I think it's important to remember that this is a Clean Air Act case, and when Ronnie stands in front of North Valmie and Reed Gardner and sees the plumes of pollution coming out of the smokestacks ---- I think that's the first problem. I concede that. Yeah. I'm looking at the last two. Tell me how those are satisfied. The redressability. Redressability and causation. Yeah. Well, her interest, her aesthetic interest is in her visits to Nevada. The resource at issue here is air, and so she breathes air when she visits, and she is concerned about the view of pollution when she visits Nevada. And it cannot be that to establish injury in fact here. She has to be hundreds of miles away from the source of the pollution, and I'm in the capital in Washington, D.C., and on a video, I see a picture of the Jarbridge wilderness, and I can see that there's a little haze out there. Does that give me standing to bring this portion of the lawsuit? I think not, Your Honor. I think there needs to be some connection with Nevada. This is I get that, but she didn't go to Jarbridge, and she doesn't plan to go to Jarbridge. And the Clean Air Act protects air, not Jarbridge itself, and it is concerned about visibility in these national parks and wilderness areas. So your position, if I understand it correctly, then, is that in order to, again, I'm not talking about the big, the plant, the reed plant, so that's a different issue. But with respect to the wilderness, it's your position that in order to have standing, all Ms. Egan has to do is to be able to see some haze from many, many, many, many miles away. Doesn't have to go there, doesn't have to be there, doesn't have to do anything, and then she's got standing. Is that correct? Your Honor, I think I want to say first of all that the primary sources of haze pollutants are coal-fired power plants. She visits the areas where those coal-fired power plants are, and she is standing at the source that causes haze. That's the other part of the case, and I concede standing on that. No question about that. But on this one, she didn't go to the power plant. She didn't stand there. She saw from, I don't know how many miles away, 20, 30 miles away, some haze. Didn't go there, didn't plan to be there. So I'm just, I'm struggling with how she has standing, how she complies with the second and third prongs of standing as to this particular segment. Just this little segment, how does she have standing? She has standing because she has an aesthetic interest in clean air. So basically everyone in Nevada hypothetically has standing. Or anyone who ever thought of visiting Nevada. I doubt that anybody ever thought about visiting Nevada, but she has regularly visited over the course of 30 years. So anybody who's visited Nevada or lives in Nevada would qualify. If they're concerned about the aesthetic impact of haze, which is regional, and while the visibility is measured, it isn't the pollution that comes out of the sources travels and it impacts all of the areas until it gets to Jarbidge. It isn't only affecting Jarbidge, it affects the entire state. And in fact, it affects beyond the state, which is why, of course, we've So, for example, in some neighboring states, someone from California would have standing in your view as to Jarbidge because the same pollution that's coming over potentially to California is going to Jarbidge. Well, the difference here, Your Honor, is that the regional haze rule, the plan that Nevada has developed, applies to Nevada, and so they are controlling air pollution within their state, not outside of their state. And air doesn't know when it crosses the state line. It's very true. Air does not know. And you make the point with respect to the Reed plant that you do have multi-state issues, do you not? Absolutely. Much of the pollution from Reed-Gardner also really impacts Grand Canyon National Park, which is sort of a hop, skip across the border. So from your perspective, the Jarbidge wilderness is part and parcel of the rest of the proceeding. There's no distinction at all based upon the fact that she's never visited there and doesn't have any plans to do so. It is very, Your Honor, it's very hard for me to imagine that when she's standing at the source of haze, she doesn't have standing. What is the source of haze? The primary source of haze in these western regions are coal-fired power plants. Okay, so you're talking about Reed then, right? Reed and North Valley as well. Yeah, North Valley also. That's not in Jarbidge, or that is in Jarbidge? It's near to Jarbidge. And the National Park Service and Fish and Wildlife Service in their comments and a letter also identified North Valley as something that Nevada should have considered as far as its impacts. I get that. I guess, again, I'm struggling with the fact that you have what seems to be a discreet portion of your complaint that deals with the Jarbidge wilderness, whose site is the basis of standing, the Mazegan, I'm saying that correctly, right? Who's never been there, doesn't plan to be there, and she sees some haze. And that's enough from your perspective. Do you think that meets Supreme Court standards of standing? I think what I am saying, I'm trying to parse this in the way that you're asking, and I'm not sure I'm succeeding. And I'm not sure that we segregate out portions of the complaint specific to Jarbidge. The complaint is about the Section 169 implementation through Nevada's plan. And so it's that provision of the Clean Air Act. If you treated the whole thing as just one big deal, then I may not have any concern. Because clearly as to the Reed Gardner plant, no question, it's just standing. No question at all. But you segregated it. And that's what I'm struggling with is how we deal with that. I can't just deal with it as one big plan, because you didn't deal with it as one big plan. You treated it as a separate issue, did you not? Your Honor, if I can try to clarify, and I am newer to this case and I wasn't part of the briefing, so I'm going to try to clarify. There are three pieces, essentially, to the regional haze rule. And they are the long-term strategy, the BART, the best available retrofit, which applies to Reed Gardner, and the reasonable progress. All three of those are part of Section 169's plan for implementation of the regional haze rule. And we have challenged two of those pieces, the reasonable progress analysis, or the lack thereof, and the BART determination at Reed Gardner. They all apply. They're all part of the regional haze rule, which is what Guardians challenges. But as I read, and I wanted to then get on to the merits, if we could, with respect to Jarbridge Wilderness, you've actually said there that you criticize or challenge the regional progress goals vis-a-vis the Jarbridge Wilderness. And as I understand it, you suggest they need to go beyond BART. That's from your complaint. What statute or regulation or other authority would require that? I'm glad you asked this, and it looked like Judge Rivera had a question also, but that really goes directly to the reasonable progress argument, and that's where that portion of the discussion comes from. It's in both the statute, 42 U.S.C. 7491, the regulations, 40 CFR 51.308D, I believe, and the EPA's guidance for how to go about developing the reasonable progress. But you have to go beyond BART? I'm trying to figure out what's the legal obligation to meet your claim, which as I read it is to, you know, BART's not enough, there's got to be something more. And where does the something more delta come from in the statute? Okay. I'm going to dive right on into reasonable progress, because I believe that this will answer your question. The statutory factors for the reasonable progress analysis, there are four of them, right, the time of compliance, the cost of compliance, et cetera, and those only make sense in the context of the analysis that the EPA's guidance on reasonable progress has published, and that's that we did cite to it, and it's in our joint appendix at 137, and that regional, that guidance on the reasonable progress analysis is essentially seven steps to this reasonable progress analysis. You start by identifying the baseline visibility, and then you identify the natural visibility, and you create this glide path, right, and you're supposed to get here 2064, but you might not, and then you're supposed to determine what pollution reductions are already going to happen, pursuant to other provisions in the Clean Air Act, pursuant to things not happening out of state, plants closing down, things like that, and then the state is supposed to identify all of the sources of the pollution reductions that are going to happen, and that contribute to regional haze, including non-BART sources. That's in this guidance. And then the state is to identify the additional control measures that would reduce emissions at those sources they have identified, and then they're supposed to do this four-factor analysis. And what I think makes it clear is when you look at Nevada's four-factor analysis, which is simply a recitation of the four factors, and then a statement that the cost of compliance is too high, I think what makes it clear that that, the requirement that the guidance provides for this process, is that it makes no sense in a vacuum. If we look just at what Nevada, the single paragraph that Nevada provided for its four-factor analysis, they say the cost of compliance is too high. We don't even know what. Cost of complying with what? Who is supposed to comply? There's absolutely no context. It's in a total vacuum. I thought they incorporated some documents by reference, including the CH2M Hill analysis. And that is part of the BART analysis, but that only applies to BART sources. And so what Nevada did was skip step four, five, and six. They determined what else was going to be happening, and then said, oh, it looks like we're doing pretty well. We're going to skip straight to step seven, which is actually establishing the regional progress goal, and we're going to set it at 11.5 because we're going to be there anyway. And so the BART analysis is only for BART sources, so it doesn't identify any other sources, and it doesn't go through this cost of compliance analysis for all of the sources that contribute to Hays. Didn't they, correct me if I'm wrong, didn't they find that because some of the sources were already meeting and exceeding BART requirements, that no further analysis with respect to a portion of these emitters was necessary? And that's true for the BART analysis. That's not true for the regional progress analysis, which is how the State is supposed to plan for the next 18 years. I guess I was confused because I thought you were trying to answer Judge McEwen's question on what you rely to for people to go beyond BART, and then I thought you got the regional analysis to explain that. But you're skipping away from her question. You're going to a whole different deal, right? I clearly failed, but I was trying to answer your question. You're basically saying that on the regional progress goals analysis, you think that taking into account the other factors inherently means you have to go beyond BART, right? The guidance, EPA's guidance ISO provides that. And I think really illustrative of what this regional progress analysis should look like, EPA recently in 2012 approved Colorado's regional haze plan, in which Colorado went through, did all of its BART analysis with BART sources, and then went through and identified all the other sources that contribute to haze. And they identified what pollutants they emit, what control measures might be used to control those pollutants, and then they went through the four-factor analysis of the statute mandates they do. And they went through all of that for each of those sources, pollutants, and potential control measures. And that is at, shoot, 77 Fed Reg. We did cite it in our reply brief, 18052, and that provides a really clear example of how this regional progress analysis should be done, and I think what I was trying to say to Judge McEwen's question is that you cannot do a four-factor analysis without identifying a source, a pollutant, and a control measure. How can you talk about the cost of compliance with a control measure without identifying a control measure, a pollutant, and a source? Well, it's also provided in EPA's guidance. EPA says specifically this is what you're supposed to do. Counsel, you're about three and a half minutes left. I want to get to one point. What is petitioner's position on the application to close Reed-Gardner? What impact does that have in this case? Well, first of all, Wild Earth Guardians would certainly welcome the reduction in pollution that would result from that, but I think it's important to understand this is a proposal at this point. Not only has it not been approved, and it may take 18 months to approve that, but it also, NV Energy has made no commitment that it will actually, it's not obligated to close. If the PUC approves this in 17 months, NV Energy could say, you know what, we're not going to do that right now. So at this point, the BART issue is definitely live, because the PUC has at least 18 months, and NV Energy could decide that it doesn't want to do this. It's not committed to closing them just because it's made a proposal to the PUC. So from our perspective, we would welcome that, because it would reduce emissions and would make a difference in air pollution, but it's not, it has not noted the issue at this point. I would so much like to. Thank you. Good morning, Your Honors. I'm David Carson here on behalf of the Environmental Protection Agency. Just as a preliminary matter, I intend to take 13 minutes of Respondent's time, and Ms. Suha and Ms. Jones will take the remaining time, so I'll do my best to sit down when the time comes. It's always hard when there's three people splitting, aren't there? Yes. So I'm trying to understand what the interests are such that we require three people. It's your choice, but. Well, that's the agreement we've reached, Your Honor, and I just would like to honor it. All right. It's like BART. It's implied. That's right, Your Honor. So I intend to focus on the Reasonable Progress Goal issue, the SO2 BART issue, and if time remains, the Section 110L issue. But before turning to the meat of that, I think it's important to point out that time has marched on in this case in two important ways. One important thing to note is that NV Energy plans to shut down the Reed Gardner units at issue here by the end of this year. What does that do for us? Well, I think. It's not moot. It's not moot yet. And has it been approved by the regulation? It has not been approved by the PUC, but I think it's just for the Court's information, the case may very well become moot by the end of the year, and so that's something that. You want to go to mediation and they can agree to shut it down and they can decide if they want to withdraw their case? I mean, would that. I mean, I just don't see what we can do given potential, you know, regularity and regular infirmities. No, you certainly have the authority to decide the case. I mean, you could also just exercise your discretion to stay your hand and see if it becomes moot. That's entirely up to you, but I think it's, you know, it's a factor that's out there that you may wish to consider. The state legislature has required a certain percentage of coal fire utility in Nevada to shut down. I think Ms. Jones' letter covers that, and so that's how it got there. The other thing to note is that the state's progress report, which we've discussed in our brief, is actually going to, it's due in November of this year, and that goes to the regional progress goal issue. And first I would like to touch on the Nevada's consideration of the statutory factors, which is one of Guardian's primary arguments. And I think the other issue is the late-breaking WRAP correction report. For both of those issues, the touchstone is reasonable progress. And ultimately it's that level of progress that will result in natural visibility conditions by the year 2064. So this regional haze program is an iterative program. It's broken down into 10-year planning periods over a 60-year period. And the states have substantial discretion in determining reasonable progress, but of course they must consider the glide path, as we've discussed in our briefs. And here, the record shows that Nevada did give sufficient consideration to the statutory factors. And I think you have to keep in mind that this case, you know, other states may do other things, but Nevada's not doing anything, and exercising their discretion, like Colorado, for example. But here there are very unique facts. I mean, first of all, when Nevada was establishing its plan, its reasonable progress goal for the first planning period, the WRAP report predicted that the emissions at Jarbidge, or visibility conditions at Jarbidge, would be better than necessary to meet the glide path in 2018, without any additional controls in Nevada. So that was a key fact that Nevada was considering. In other words, I mean, it was going to, per se, be reasonable progress already, because it was going to be below or better visibility conditions than the glide path. Is that because the natural conditions in Nevada are what produce most of the haze, having nothing to do with humankind? There are some anthropogenic sources that impact Jarbidge, but the overwhelming majority of those are from out-of-state sources, and that's another factor that Nevada considered here, which is, when it started looking at the cost issue, I mean, first of all, you know, it was already going to be reasonable progress at Jarbidge, because meeting the glide path, or better than the glide path, actually, to the overwhelming majority of impacts are from out-of-state sources. So when Nevada looked at, should we impose additional controls on Nevada's sources under these circumstances, it gave substantial weight to the cost of compliance factor. And basically, this said, look, we're looking at all these other factors in the joint appendix at page 404 through 405. Nevada discussed the factors. It didn't discuss them in as much detail as guardians would like, but it discussed the factors and said, under these circumstances, under these unique facts, we are not going to require any additional cost on any Nevada sources, because we don't need to to make reasonable progress. And that was a reasonable way to do it. There was simply a deeper... Ginsburg That's a little bit different than counsel had represented it. So you're suggesting that they gave weight to cost, but they were already there, so they didn't need to impose, didn't need to bear any additional cost, because they really were already there. Counsel is saying, well, no, they relied on cost as a factor, saying, in effect, that they didn't need to impose any additional cost, because the cost was too significant to impose more. So which is it? I mean, how actually did cost figure in? Because counsel suggests they kind of did a leapfrog from skipping the guidelines to coming to kind of a summary conclusion. Well, the State was certainly aware when it came up with its reasonable progress goal that the visibility at Jarbidge was predicted to be better than necessary to meet the glide path in 2018 without additional controls. So it then focused on, all right, what more do we need to do? And certainly the State has discretion if it wants to go beyond that to do it. But again, the touchstone is reasonable progress in balancing the factors. Ginsburg So it's not that it would cost too much. It's that they didn't need to incur any additional cost. They decided that it would not be reasonable to impose additional controls, the cost of additional controls on any Nevada sources under the circumstances. In light of the unique facts there, where they were meeting the glide path and where the overwhelming majority of manmade impacts at Jarbidge are from out-of-State sources. And one of the things they considered was the cost. And yes, they considered the cost. And that is one of the factors. And basically what they determined is that it just outweighed the cost. And the detailed discussion of those simply was not necessary. I'd like to turn now to another issue regarding the reasonable progress goal was the late-breaking WRAP report, which was a correction to its initial projection for visibility at Jarbidge. And, you know, that came in 16 months after the State had made its reasonable progress goal. And EPA did consider it and made a judgment call not to require the State to do it over. And the primary thing that Guardians argues in its brief is this Court's decision in the Sierra Club case. And in that case, basically, EPA decided that there were two baselines before EPA, and it decided based upon those two baselines. And it decided based upon a written policy document that it was not going to consider the second baseline that came in after the SIP came in. And the Court's holding is, we hold that EPA's failure to even consider the new data and to provide an explanation for its choice rooted in the data presented was arbitrary and capricious. But the Court noted that its role was not to substitute its judgment for that of EPA in determining what to do. It basically said, you need to consider it and you need to provide an explanation. And EPA did that here. EPA Excuse me, counsel, but where's the explanation? I mean, I think you're referring to the statement in DPA materials. Right. Moreover, any correlation or correction to the modeling results at this time should be based on an update of all the data used in 2007 to model visibility projections. For example, the visibility modeling did not include admission reductions for more recent bar control decisions in ignoring and neighboring states. Basically, you just sort of said, well, it's fine. I saw no explanation offered. Well, the explanation is, there are several things. First, there's that. Is the explanation in the record or are we going to hear that now? It's the explanation that you were just looking to, Your Honor. It's in footnote 18 of the notice of proposed rulemaking. That's where EPA addressed it. EPA addressed it in several ways. First, it noted that Nevada had reasonably relied upon the initial RAP report when it made its determination, its reasonable progress goal, and that, you know, the second one came rather late in the process. And, in fact, it came 16 months after the state had provided its reasonable progress goals to EPA for approval. Second, it noted that it would take considerable time and resources for the state to do it over. And within that, EPA made a scientific judgment call that at this point in the game, you know, time has marched on a little bit here, and there are, it mentioned the fact that the RAP modeling had not taken into account reductions from BART in other states that might impact, in some cases, the visibility impairment of garbage. And it did take into effect several coal-fired power plants that were slated to be built in Nevada, and only two of them, there were five, and only two of which are going forward. And that's later discussed in the same notice of proposed rulemaking. So EPA made the scientific judgment call that, look, if you're going to reconsider this, you really need to reconsider all of that. And that is a substantial, I mean, basically the whole, EPA's whole point was, when you look at the time and resources necessary to do that, it is a substantial undertaking. I mean, it really would have required, you know, a regional emissions inventory like the RAP did, which is a substantial exercise and more modeling that would take, it would really take them years to do, to do this over. So EPA took all of that into account, and it took into account the fact that, again, in November of this year, the state has to come up with a progress report showing where, you know, basically it's based upon the past five years, but it shows whether or not the state is on track to meet the reasonable progress goal that it chose for jarbage. And if it's not, then the regs provide, depending upon the source of, you know, the reasons why it's not meeting the goal, it provides pathways for the state to address that. So basically, I think what EPA did was essentially what Sierra Club requires. I mean, it considered the fact that there was this new report, and it exercised its judgment as to what under the regulatory scheme should we do about it. It didn't say based upon a policy, we don't have to do anything. It said when you look at the facts, when you look at the time and resources necessary, the fact that there are questions about, you know, what is really going to happen there at jarbage in 2018 based upon things that the RAP did and didn't consider that may not be accurate at this point, and when you consider the regulatory scheme, which is, we got this progress report coming up, and this is an iterative 60-year process. So I think under the circumstances, Your Honor, that EPA complied with this Court's direction in the Sierra Club case. I see I've only got 30 seconds left here in my agreement, which I suppose is not surprising, but I think I'll just say that I think it's important to note that the S.O.B.A.R.T. is an omission limitation that is achievable on a continuous nature. And guardians have simply not shown that the State, that the source can do better than the limit that was imposed on a continuous nature. Thank you, Your Honor. I request that you. Ms. Suey. Ms. Suey. Good morning, Your Honors. May it please the Court, my name is Belinda Suey, and I represent the NDP. I would like to focus my time on the standing issue and time remaining on the jarbage RPG reasonableness and the reasonableness of the brief garment. Ms. Garment. Three and a half. Ms. Garment. All right. Why don't we just stop for a second. Could you put three and a half minutes on the clock, because otherwise we'll all be confused. Why don't we do this. I just suggest that it's very hard to split argument in these ways, but because you have decided to, I'm just going to put four minutes on the clock. That will be easier. We don't really kind of divide our minutes here. All right. Thank you, Your Honor. So as you pointed out, Ms. Egan, the declarant, has never visited jarbage and she never intends to visit jarbage. Her aesthetic enjoyment of jarbage, which the regional Hays rule is intended to protect, is nonexistent. I would then argue that even if there is an injury associated with regional Hays, which the regional Hays rule is not intended to protect, the petitioners have failed to show a more aggressive RPG. There's no substantial likelihood that this would necessarily result in additional controls at Valmy. As we pointed out, the primary sources of regional Hays for jarbage are natural and out-of-state sources. So it would make sense that a more aggressive goal would attack those sources and not necessarily Valmy. Well, it doesn't have to fix the problem. That goes to the merits. But there could be some regressibility, right? I mean, it doesn't have to be perfect regressibility. Well, I don't know that there's a substantial likelihood that there would be additional controls on Valmy. So if that's her injury, there's no substantial likelihood that a more aggressive RPG is going to redress that injury at all. For purposes of analyzing standing in this case, are we considering this as a procedural rule that we're considering, or is this a procedural rule that we're considering? I think it is procedural, but I still think, you know, the requirements of standing still apply. No, and what I'm talking about, you're familiar with Mass v. EPA? No, I'm sorry. Okay, a Supreme Court case that has some real bearing here in that they've made the distinction that standing rules are relaxed in a case, whereas if you actually are imposing a substantive requirement on somebody, then you go back to the Lujan rules. If you're not familiar with it, I won't ask the question, but that was my question, is, is this, are we considering this in a procedural context in the light of Mass v. EPA, or are we looking at a substantive? I think Lujan definitely applies here, that they have to have a showing of regressibility. And, you know, they don't have that here if their injury for jarbage is Vellman. And similarly, the same analysis goes for Reed-Gardner. With no controls, their contribution to visibility at the wilderness areas that Ms. Egan does visit is less than one deciview. This isn't a noticeable contribution to regional haze. And so here the petitioners argue for relatively small additional decrease to the bar SO2. They haven't shown a substantial likelihood that this will result in any increase to haze in Zion or Grand Canyon National Parks, particularly an increase that would be visible by Ms. Egan. Counsel, help me on this. Are you arguing, then, in favor of there's no standing at all in this case? If there's standing for some aspect of it, if there's standing for some aspect of it, what is it? I'm arguing that they have no standing at all. They haven't shown an injury, and where they could potentially have an injury, they haven't shown that the relief that they request, that there's a substantial likelihood that that would address the injuries. That's even true of Reed-Gardner? Yes. Because Reed-Gardner contributes less than one deciview of haze to the areas that they visit, which isn't perceptible to a person. And with the relatively minor decrease that they're advocating for in the bar SO2, there's no substantial likelihood that this is going to have any effect on haze in the parks that she does visit, especially a change in haze that she can see. Thank you. Thank you very much for letting me have some time. I appreciate it very much. I'm Lisa Jones here on behalf of NV Energy. And I just wanted to try to do a little bit of cleanup here. First of all, I just wanted to point out that... You need to shut down your plant, that would be one thing, right? That's right, yes. I think that you have all read the 28-J letter, but if you have any questions about it, I'd be more than happy to talk about it. Do you disagree with the analysis that's been discussed here today, which is really it has no impact on us? At this exact moment, it doesn't have any impact on you, that's correct. I mean, we said in the 28-J letter that there is a doctrine of prudential mootness. I don't think we're actually quite there yet either, but I wanted the court to be sure that they understood that this is a serious filing that NV Energy provided to the Public Utilities Commission. Of course, I cannot speak for how this is going to come out, but given the amount of megawatts that have to be retired, it would be sensible to be looking towards the units that NV Energy had requested be retired. Which is units 1, 2, and 3 at Reed Gardner. Of course, we don't know that right now. I think we have 160 days now instead of 180, something around there. But I wanted the court to be aware, and if there was anything that you all decided was appropriate to do, that's fine. I just wanted to also point out that with respect to the 2018 inventory, Mr. Carson had talked a little bit about some of the plants that weren't built. I think it's very important to understand that we've got 2,900 megawatts that are now in the submissions inventory, but were not built. They were either withdrawn or they put it on hold. So basically just with two plants, because I don't know the megawatts for every plant, but for the white pine, which was never built, that's a 1,200 megawatt plant, would have been a big, big plant. I'm not sure I understand this. You're saying that these plants, two plants, that would have produced in full capacity 2,900 megawatts that are included within the projections that the EPA reviewed, will not be built. That's right. And therefore, for purposes of future analysis, will further reduce the amount of pollution and haze and so on that is emanated from these sources. Specifically right here, we're talking about the SO2 emissions. It would make an enormous difference if these plants were built and emitting SO2, but they're not built, they're not going to be built. At this point, have you withdrawn any requests for permits to build them? What can we look to to see that they're not going to be built? I'll give you a JA site and then I'll explain it. JA 1187 lists these plants out. The plants that are not being built, there's one called the Sith Global. They withdrew their application. I don't know why. Maybe they had other fish to fry. Then there was a Sempra, which also withdrew the application. This was for a plant that would have been created at Copper Mountain. The White Pine was the 1,200-megawatt plant that was never built and is never going to be built. And NV Energy withdrew an application for Eli, which is a 1,500-megawatt. These are all going to be, what, coal-fired, as originally planned? These are coal-fired. So these are all still in the 28 inventory. There's also a Tokwap, I'm not sure if I'm saying that correctly, that had an application out, but they closed that application. So the emissions inventory isn't correct. So to the extent that we're talking about reasonable progress goals and if Nevada is actually meeting or beating the reasonable progress goals, you take all those out. If, let's just say that maybe they're not meeting right now, they certainly would be meeting once these things are out and aren't taken into account. Thank you. We'll just put three minutes on the clock, just in the spirit of equity. Very much appreciated. I'm going to try to really briefly talk about a couple of different pieces. One is I just want to get back, of course, to Ronnie's declaration and the standing that she provides for Wild Earth Guardians. And she has two essential concerns, aesthetic concerns and health concerns. And they are impacted by haze in Nevada. And for that reason, failing to further reduce emissions impacts, injures her interests aesthetically and her health interests as well. And then the second thing I wanted to say was that it's really important to understand that for the reasonable progress analysis, those four statutory factors, that's not discretionary. It's true that the state has considerable discretion in how it's going to go about considering those four factors. But both the state, the statute, the regulation and the guidance say they must consider the factors. In fact, the reasonable progress guidance specifically identifies the possibility that after going through the analysis, the state may decide it's not going to do anything further, it's going to only do essentially what Nevada did, which is say we're doing well enough, we're not going to require anything more. And EPA says at a minimum the state must consider the four statutory factors. And where that consideration occurs in Nevada's plan is at 617, it's not in Section 4 of the plan, it's at 617 and it's a single paragraph. And I think there's ample precedent from this court that a recitation of factors, Ben-Ovi Shalala says that stating that a factor was considered is not a substitute for considering it, and in NRDC v. EPA, this court has said that where an agency has failed to consider mandatory statutory factors set forth by statute or regulation, its action must be set aside. And that's what's happened here, a single sentence that lists the statutory factors. Can you give your view that they did not incorporate anything in by reference, which was the basis of their analysis? Your Honor, the problem is that the only thing they could incorporate would have been NV Energy's consultant's BART analysis, and that only applied to BART-eligible sources. And there are other sources within the state, for example, Unit 4 at Reed Gardner, that was not, it's a large power plant unit, it was not considered for any reduction in emissions, and again, North Valley that we talked about earlier, those were not identified as any sources, and that's the process that RP provides, is that they identify sources in addition to those BART sources, in addition to what's happening outside of the state, in addition to the plants that aren't going to be built. That analysis is required by the statute. That analysis did not occur, and EPA has no discretion to approve a plan that doesn't contain the mandatory pieces for the plan that's set forth by statute and regulation. Oh, gosh. I don't have any more time, but I wanted to say very quickly that BART, the entire intention, the purpose of the statute, the definitions of BART, are to reduce pollution in the air, and where the SO2 emissions are going to be reduced, that new limit allows more pollution than actually occurs now. It allows for an increase in pollution over and above what actually occurs. That doesn't satisfy BART. And I think with that, I have to close. Oh, wait, I got more time. I thought it said 12 seconds. No, actually, you see, you're into the red. It's a little confusing, I admit. Thank you. You know you ended right when you should. So I appreciate it. Thank all of you for your arguments this morning. Wild Earth Guardians versus EPA is submitted.
judges: Robart, McKeown, Smith